IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

PHILIP JAAX,                          )
                                      )
                Plaintiff,            )
                                      )
        v.                            )        Case No.
                                      )        13-0944-CV-W-REL-SSA
CAROLYN W. COLVIN, Acting             )
Commissioner of Social Security,      )
                                      )
                Defendant.            )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

        Plaintiff Philips Jaax seeks review of the final decision of the Commissioner of Social

Security denying plaintiff's application for disability benefits under Titles II and XVI of the

Social Security Act ("the Act").  After a careful review of the evidence and applicable law, I

find that the substantial evidence in the record as a whole supports the ALJ's finding that

plaintiff is not disabled.  Therefore, plaintiff's motion for summary judgment will be denied

and the decision of the Commissioner will be affirmed.

## I.      BACKGROUND

        On November 13, 2009, plaintiff applied for disability benefits alleging that he had

been disabled since March 15, 2008.  Plaintiff's disability stems from "ADHD, Depression &

breathing problems, mood and anxiety disorders, PTSD & sleep disorders, personal injuries

from Wal-Mart Pharmacy filling wrong prescription." (Tr. at 135).  Plaintiff's application was

denied on August 23, 2010.  On March 8, 2012, a hearing was held before an Administrative

Law Judge.  On April 27, 2012, the ALJ found that plaintiff was not under a "disability" as

defined in the Act.  On July 31, 2013, the Appeals Council denied plaintiff's request for review.

Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental

2

impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff, vocational expert Joseph H. Torres,

M.Ed., and medical expert Joseph Malancharuvil, Ph.D., in addition to documentary evidence

admitted at the hearing.  Plaintiff also attaches an "Attending Physician's Statement" to his

brief, although that exhibit was not a part of the record before the ALJ.

## A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

The record shows that plaintiff earned the following income from 1997 through 2011:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1997 | $ 2,462.68 | 2005 | $ 10,569.69 |
| 1998 | 5,248.38 | 2006 | 18,959.66 |
| 1999 | 52.50 | 2007 | 42,472.77 |
| 2000 | 2,278.11 | 2008 | 29,669.69 |
| 2001 | 211.57 | 2009 | 8,429.00 |
| 2002 | 17,855.81 | 2010 | 8,389.48 |
| 2003 | 11,032.93 | 2011 | 0.00 |
| 2004 | 7,092.56 | | |

(Tr. at 132-133).

### Missouri Supplemental Questionnaire

In a Missouri Supplemental Questionnaire dated July 10, 2010, plaintiff indicated that

he uses a computer for one to two hours at a time (Tr. at 176).  He has a driver's license but he

does not drive because he doesn't have a car and he is an "irresponsible driver at times" (Tr. at

176).

4

**Function Report - Third Party**

Plaintiff's mother completed a Function Report - Third Party on August 8, 2010 (Tr. at 179-186). She reported that plaintiff watches a lot of news shows on television. Plaintiff prepares his own meals daily, and his cooking habits have not changed as a result of his condition. He does his own laundry but performs no other household chores. He has to be encouraged to pick up after himself. When he goes out, he is able to walk, ride in a car, use public transportation, drive, and he can go out alone. He shops for food, clothing and medicine in stores. Plaintiff has anger problems and does not follow or understand directions. He can walk two blocks before needing to rest.

**B.    SUMMARY OF TESTIMONY**

During the March 8, 2012, hearing, plaintiff testified; and Joseph Torres, M.Ed., a vocational expert, and Joseph Malancharuvil, Ph.D., a medical expert, testified at the request of the ALJ.

**1.    Plaintiff's testimony.**

Plaintiff has a bachelor's degree (Tr. at 30). He last worked the month before his administrative hearing and was terminated a few days before the hearing (Tr. at 26). He was working as a tax preparer for Jackson Hewitt (Tr. at 26). Plaintiff testified that he was terminated because Jackson Hewitt could not accommodate him by providing sensitivity training dealing with his specific disabilities and could not give him time off to go to doctor appointments and for his administrative hearing (Tr. at 26). Plaintiff was also trying to help out his employer by doing research on his own regarding fraud that he suspected was going on in the company; however, his employer did not believe he should be spending his time on that rather than on his assigned duties (Tr. at 26-27). Plaintiff was also being "especially friendly to females" at work and his employer felt that he was creating a hostile work environment (Tr.

5

at 27). Plaintiff tried working from home but that did not work out: "I was trying to go beyond my job description, and I was noticing some different types of fraudulent exercises that were occurring within the company and notifying them, and they said that was outside my job description and they were unable to accommodate me again, so, for that position." (Tr. at 27-28).

Plaintiff did not work from December 2008 to October 2009 (Tr. at 28). Between 2008 and 2010, he got back pay from lawsuit settlements from two companies and he lived off that (Tr. at 28). After December 2010, plaintiff received unemployment compensation -- he indicated that he was willing and able to work full time (Tr. at 28).

Plaintiff currently lives in a house with his mother and sister (Tr. at 29). Plaintiff has a driver's license and drives sometimes, although he speeds too much and sometimes drives recklessly (Tr. at 29). He drove to the administrative hearing (Tr. at 29). He does not drink alcohol as long as he takes his medication –- "I'm very stabilized when I take my medication." (Tr. at 31). The last time he consumed alcohol was the beginning of February, i.e., the month before his administrative hearing (Tr. at 31). Plaintiff would typically use alcohol (six to ten beers a day) after losing a job because he would become lost (Tr. at 33). He was not taking his medication properly and he was very sad that he was not able to keep a job (Tr. at 33).

Plaintiff owned a $20,000.00 boat that he did not know how to operate -- he had it for his friends to use (Tr. at 31). Plaintiff said it was too complex for him to operate (Tr. at 32). Someone stole it in July 2010 (Tr. at 31-32).

At the time of the hearing, plaintiff was attending Swope Parkway Behavioral Health Center and he was trying to get "intensive outpatient" through either Truman Medical Center or Shawnee Mission Medical Center (Tr. at 32). He wants to get treatment for his mood

disorder, his anxiety and his inability to keep a job (Tr. at 32-33). "[E]ven with medication, I still have trouble. I, I still have trouble sometimes managing my life." (Tr. at 33).

In a typical day, plaintiff spends a lot of time researching spirituality and the law on the Internet (Tr. at 39). He reads about what is going on in the world (Tr. at 39).

When plaintiff does have a job, he becomes too focused on finding fraud rather than doing his job (Tr. at 40). He believes he is incapable of being a nighttime janitor, where he would not be around a computer or fraud, because he would "end up finding a computer" and doing his own research instead of doing his job (Tr. at 40-41). "I have to do research, constantly" (Tr. at 41). If he had a janitorial job where there were no computers around, he would wind up getting on his mobile phone to get on the Internet (Tr. at 41).

When he starts to research who he is and where he comes from, he finds that it is more important for him to find answers than it is to work (Tr. at 47). Plaintiff believes that this is worse when he is sober (Tr. at 47).

Plaintiff has a hard time with authority (Tr. at 41). He can't tolerate someone ordering him around all the time or yelling at him (Tr. at 41).

Plaintiff has friends he talks to occasionally, but most of his friends have families now and have gone their own way (Tr. at 42).

Plaintiff has nightmares frequently (Tr. at 42). He has been doing a lot of research on Luciferianism and Satanism and he has nightmares about those things (Tr. at 42). On a good night, he sleeps five or six hours; other nights he gets no sleep at all (Tr. at 42). During the day plaintiff gets very scared that he is dying (Tr. at 43). He has panic attacks all the time (Tr. at 43). He recently had three panic attacks and was hospitalized, just a few days before the hearing (these hospital records are not a part of the administrative record) (Tr. at 43). He has three or four panic attacks every two to three weeks (Tr. at 43). He hyperventilates, he gets

very scared, he feels like he is about to lose something (Tr. at 43-44). His panic attacks last a day, sometimes longer (Tr. at 44).

Plaintiff has never been treated for post traumatic stress disorder, but it stems from when his father was murdered when plaintiff was eight years old (Tr. at 44). Plaintiff, at age 31, cannot get over his father's death and it causes him problems on a daily basis (Tr. at 44). He thinks people are out to kill him like they killed his father (Tr. at 45). The week before the hearing, he got lost in Lee's Summit and "several hours later, I didn't even know where I was. I was miles, miles away from the city."[1] (Tr. at 45).

Plaintiff has problems with concentration and an inability to focus -- he cannot follow instructions (Tr. at 45). When he does have a job, he spends his time trying to find fraud or someone's illegal actions and it becomes an obsession to him (Tr. at 45). He tries to read a couple pages of a book but he gets stuck on the first couple of sentences over and over for up to 45 minutes at a time (Tr. at 45-46). When he is reading the Internet, he has to read things ten times to get through it and move onto something else (Tr. at 46).

Plaintiff does not cook (Tr. at 46). His mother and sister are getting fed up because plaintiff does not prepare any food, and sometimes he just doesn't eat (Tr. at 46). Plaintiff used to go out, but recently he has not been; and since he was fired from his last job he had not been going out at all (Tr. at 46).

2.    **Medical expert testimony.**

Medical expert Joseph Malancharuvil, Ph.D., a clinical psychologist, testified at the request of the Administrative Law Judge (Tr. at 30). Dr. Malancharuvil reviewed plaintiff's medical records (Tr. at 30).

---

[1]This appears to contradict plaintiff's testimony that he does not drive.

Plaintiff has ADHD but it is not significant -- he was able to complete a Bachelor's degree (Tr. at 33-34). He has a mood disorder not otherwise specified[2] with narcissistic features (Tr. at 34). Plaintiff has no restriction in activities of daily living; mild limitations in social functioning; and mild limitations in cognitive disruption, persistence or pace (Tr. at 34). Plaintiff does not have a serial psychiatric problem but his "personality style . . . seems to get him into trouble" (Tr. at 34). That, however, does not preclude all functions (Tr. at 34). As a result, plaintiff would be restricted to tasks that do not require emotionally charged, intense, interpersonal interactions (Tr. at 34). "So, he's not a candidate to be a [inaudible] or an HR person, or things like that, where emotional processing is required for -- as an essential part of [the] job. But on normal transactions there are no problems." (Tr. at 34). Plaintiff needs no other restrictions unless he continues to drink, and in that event he should not operate any hazardous machinery (Tr. at 35).

Although plaintiff's medical records mention questionable psychosis, Dr. Malancharuvil found no evidence of psychosis (Tr. at 35). "[T]he overall picture [from the medical records] is that the claimant definitely has some underlying issues, most personality related, and it is not unusual with people with this personality to have periods of depression when things do not go the way they want it to go. It's a reactive depression, which is inherent to the personality side, but it is not a mental illness per se." (Tr. at 35-36). Consistent with his personality and interpersonal problems, he has gotten into serious difficulties and trouble -- he feels very empty and depleted and becomes despondent (Tr. at 36). "A casual evaluation

_____

[2]An abbreviation for the medical term "not otherwise specified," NOS is used as a broad-based diagnostic category. The choice of the NOS diagnosis means that the diagnosing doctor believes that the patient's problems fall into a particular family of disorders (e.g., depressive disorders, anxiety disorders, etc.) but that there is not enough information at the time of diagnosis to better specify the type of disorder.

9

would make it look like he has bipolar condition, but it is not. It's really -- he's not -- he will not present himself consistently with the same type of mood." (Tr. at 37).

There is nothing that prevents him from carrying on normal transactions in his social life (Tr. at 37). He is very charming, and he was overly social with the women in his office -- he has social ability (Tr. at 37). He is not necessarily using his judgment in the relationships (Tr. at 37). Despite the consistent diagnoses of ADHD, plaintiff only has mild impairments in concentration, persistence and pace (Tr. at 38). "[I]f he has ADHD from childhood, and he has successfully completed a Bachelor's Degree, and he's engaged in activities that require quite a good bit of skill, you now, tax preparation, consultation, and other types of things. His Attention Deficit Hyperactivity Disorder, while it may be there, it's not interfering with his capacity to function within the limits I have assigned." (Tr. at 38). There is no objective basis that he has adult ADHD (Tr. at 38). The doctors simply keep repeating it in the records after it is first mentioned -- there is no test indicating he continues to have a significant problem with ADHD (Tr. at 38).

### 3. Vocational expert testimony.

Vocational expert Joseph Torres, M.Ed., testified at the request of the Administrative Law Judge. Plaintiff's past work includes tax accountant, DOT 160.162-010, sedentary, SVP of 8; collections clerk, DOT 216.362-014, sedentary, SVP of 5; bank teller, DOT 211.362-018, light, SVP of 5; and chauffeur, DOT 913.463-018, medium, with an SVP of 3 (Tr. at 49).

The first hypothetical involved a person with a college education; has no exertional limitations; must avoid concentrated exposure to pulmonary irritants and avoid exposure to excessive heat, cold or humidity. The person should have no emotionally charged or intense interaction with others, no work at unprotected heights, no work around hazardous or dangerous machinery. He could not be responsible for the safety of others and he could not

Case 4:13-cv-00944-REL   Document 30   Filed 01/26/15   Page 10 of 43

perform a job requiring hypervigilance (Tr. at 49-50). Such a person could work as a tax accountant or a collections clerk (Tr. at 50).

The second hypothetical was the same as the first except the person, due to an inability to focus consistently for a long period of time, would not be able to put together detail-oriented work (Tr. at 50). Such a person could not perform any of plaintiff's past relevant work, but the person could work as a hand packager, DOT 920.587-018, medium, with 195,000 jobs in the country and 2,500 in the region (Tr. at 50-51). The person could also work as a janitor, DOT 381.687-018, medium with an SVP of 2, and there are 200,000 such jobs in the country and 3,100 in the region (Tr. at 51).

If the person would be off task 20% of the time due to difficulties focusing, the person could not work (Tr. at 51).

## C.    SUMMARY OF MEDICAL RECORDS

On May 18, 2007, plaintiff saw Glenda Blomquist, M.D.[3] (Tr. at 273). Plaintiff's mail order pharmacy had not sent his Adderall[4] so he had been feeling tired. "Has felt well balanced. Starting on-line grad school." He reported rare alcohol use. He said his Lamictal[5] made him feel tired with some reduced productivity. He was prescribed Paroxetine,[6] Lamictal and Adderall, and he was given a ten-day supply of Adderall while plaintiff was waiting for his mail order.

---

[3]This record is handwritten and the signature is illegible; however, because it is grouped with Dr. Blomquist's other records I assume she was the author.

[4]Adderall (amphetamine and dextroamphetamine) is used to treat ADHD.

[5]Lamictal is a mood stabilizer.

[6]Also known as Paxil, Paroxetine treats depression, obsessive-compulsive disorder, panic disorder, social anxiety disorder, premenstrual dysphoric disorder, generalized anxiety disorder, and posttraumatic stress disorder.

11

On July 27, 2007, plaintiff saw Glenda Blomquist, M.D.[7] (Tr. at 270). He reported he had gotten all the reports about his father's murder and that his friends told him he was getting too obsessed. "Moods are really good. Doing well with school and job." His mental status exam was normal. He was diagnosed with Bipolar disorder not otherwise specified,[8] ADHD episodic,[9] and alcohol abuse. He had stopped taking his Lamictal but was taking Paroxetine and Adderall. He was told to resume taking Lamictal.

On November 2, 2007, plaintiff saw Glenda Blomquist, M.D.[10] (Tr. at 269). He reported being anxious about money, work and classes. He had no clear hypomanic episodes but was irritable at times. Plaintiff was at that time using a CPAP for sleep apnea and he was on Accutane (treats acne). He was noted to be neatly dressed, tense and restless. He was

---

[7]This record is handwritten and the signature is illegible; however, because it is grouped with Dr. Blomquist's other records I assume she was the author.

[8]"Bipolar disorder -- sometimes called manic-depressive disorder -- is associated with mood swings that range from the lows of depression to the highs of mania. When you become depressed, you may feel sad or hopeless and lose interest or pleasure in most activities. When your mood shifts in the other direction, you may feel euphoric and full of energy. . . . Although bipolar disorder is a disruptive, long-term condition, you can keep your moods in check by following a treatment plan. In most cases, bipolar disorder can be controlled with medications and psychological counseling (psychotherapy)."
http://www.mayoclinic.org/diseases-conditions/bipolar-disorder/basics/definition/con-200 27544
  See footnote 2 on page 9 for a definition of the reference "not otherwise specified."

[9]"Adult attention-deficit/hyperactivity disorder (ADHD) is a mental health condition exhibited by difficulty maintaining attention, as well as hyperactivity and impulsive behavior. Adult ADHD symptoms can lead to a number of problems, including unstable relationships, poor work or school performance, and low self-esteem. ADHD always starts in early childhood, but in some cases it's not diagnosed until later in life. . . . Treatment for adult ADHD is similar to treatment for childhood ADHD, and includes stimulant drugs or other medications, psychological counseling (psychotherapy), and treatment for any mental health conditions that occur along with adult ADHD."
http://www.mayoclinic.org/diseases-conditions/adult-adhd/basics/definition/con-2003455 2

[10]This record is handwritten and the signature is illegible; however, because it is grouped with Dr. Blomquist's other records I assume she was the author.

assessed with Bipolar Disorder and ADHD, episodic.  Plaintiff had been taking Adderall, Paroxetine and Lamictal, but he decreased his Lamictal dosage due to fatigue.  He was told to resume taking his normal dose of Lamictal.

On January 23, 2008, plaintiff saw Glenda Blomquist, M.D. (Tr. at 268).  "Reports his anxiety is pretty much controlled but he is worried re economic outlook.  Having more social anxiety which he attributes to not drinking.  Didn't increase his Lamictal to 50 mg as he was fearful of sedation.  Stress in workplace/job security."  His mental status was "rather anxious but euthymic.[11]"  Plaintiff was assessed with mood disorder[12] not otherwise specified with a fair prognosis.  He was taking Lamictal, Adderall and Paroxetine.  He was told to increase his Paroxetine, increase his Lamictal, and return in three months.

On February 10, 2008, plaintiff went to the emergency room at Menorah Medical Center complaining of an anxiety attack and stress (Tr. at 383-400).  He weighed 183 pounds (Tr. at 385).  The records reflect that he had "started drinking again" (Tr. at 386).  His anxiety was described as moderate, situational and related to work (Tr. at 386).  He appeared moderately anxious.  He was assessed with acute anxiety and discharged with a prescription for Paxil (Tr. at 387).  He was told to consume no alcohol and to follow up with his treating physician (Tr. at 399).

March 15, 2008, is plaintiff's alleged onset date.

---

[11]Euthymic pertains to a normal mood in which the range of emotions is neither depressed nor highly elevated.

[12]"If you have a mood disorder, your general emotional state or mood is distorted or inconsistent with your circumstances." http://www.mayoclinic.org/diseases-conditions/mood-disorders/basics/definition/con-20035907
Examples of mood disorders include major depressive disorder and bipolar disorder. See footnote 2 on page 9 in regard to the reference "not otherwise specified."

13

On June 27, 2008, plaintiff was seen at the Department of Psychiatry and Behavioral Sciences at the University of Kansas (Tr. at 572). Plaintiff had stopped taking his medication "due to drowsiness/ran out." He was having fits of rage, was driving too fast, was staying in bed all week. "Quit meds b/c felt he would be fine without it." He said he was in danger of losing his job, he was calling in sick a lot. He had been irritable and yelling, he was not allowed at his house by his roommate so he was living with his mother. He reported drinking six beers the previous night.

Plaintiff was noted to have fair hygiene and grooming. He was cooperative with good eye contact. His speech had increased volume and he admitted to yelling at his family a lot. His mood was irritable, his affect was dysthymic (depressed). Plaintiff had been taking no medication. He was assessed with ADHD, rule out bipolar disorder II, and alcohol abuse. Plaintiff was counseled on taking his medication as directed and abstaining from alcohol.

On July 23, 2008, plaintiff was seen at the Department of Psychiatry and Behavioral Sciences of the University of Kansas (Tr. at 570-571).

> He reports his life is "topsy-turvy" mainly due to financial problems. He is very worried about the future - believes it holds "prison, death or living on the streets." He says he has taken 15 days off in the past month trying to get loans, incorporated his tax business, searches the internet for hours a day - he owns $20,000 boat and is making payments on 2 cars in a sort of leasing agreement with his employer, Chrysler. He has overdrawn his checking account, staying in hotels as he does not like living with his mother. He feels he is just not "paying attention" when he writes checks for things he cannot afford. Sometimes thinks about running off to NYC and feels this would be a way to escape the debt as they would not be able to find him. Resists selling boat/car due to bad economy but also because he is on a "quest" to achieve financial goals of eventually buying a condo and meeting new friends. Reports he feels he has lost everyone and his friend "used him" for his money. Estimates he spent $60,000 in the past year on friends, trips - nothing really "frivolous." . . . Feels terrible, ready to "give up" but repeatedly states he is not suicidal.

> He was observed to have good grooming. He was cooperative with good eye contact.

His speech was pressured which was noted to be usual for him. He reported that his mood was

14

"terrible". His affect was expansive, "chuckles at times." His thought processes were somewhat linear and goal directed. He was noted to have poor judgment.

He was diagnosed with ADHD, rule out bipolar mixed episode. "Pt not doing well on Lamictal. Trial of Invega[13] to help organize thoughts and stabilize mood."

On August 12, 2008, plaintiff saw Glenda Blomquist, M.D. (Tr. at 267). Plaintiff reported being tired all the time. He said he was wearing his CPAP for sleep apnea but could fall asleep easily during the day. "Mood is terrible because he's tired all the time. Still has job and got promoted. Anxiety is pretty level but social anxiety is increased quite a bit. Didn't go to friend's goodbye party last week even though he had bought a gift for him secondary to anxiety. Generally sleeps well." Plaintiff reported that he does not drink. Plaintiff said his Lamictal was making him sleepy. He was taking Paxil, Lamictal, and Adderall. There is no mention of the Invega he had been prescribed three weeks earlier. Dr. Blomquist told him to decrease his Lamictal for two weeks and then discontinue. She diagnosed mood disorder not otherwise specified with a fair prognosis and told him to return in two months.

On August 21, 2008, plaintiff was admitted to Menorah Medical Center for an evaluation for possible suitable alternatives to a CPAP for sleep apnea (Tr. at 287-295). David Rudman, M.D., examined plaintiff.

> He does have a history of chronic alcohol and drug use and abuse. Previously he had used cocaine 7 years ago, but currently not using any type of illicit drugs.

> The patient does have diagnosis of bipolar disorder and has medications which include Adderall XR, Paxil, Loratadine,[14] albuterol[15] as needed, and Advair.[16]

---

[13]Invega is an antipsychotic.

[14]Loratadine is an antihistamine that treats allergy symptoms.

[15]Albuterol is a bronchodilator which treats asthma and bronchitis.

[16]Advair prevents symptoms of asthma. It contains a steroid and a long-acting beta-agonist.

15

Plaintiff was 5 feet 6 inches tall and weighed 195 pounds. He was diagnosed with obstructive sleep apnea, chronic tonsillitis, nasoseptal deviation, and hypertrophic turbinates. Dr. Rudman performed a uvulopalatopharyngoplasty, tonsillectomy, nasal reconstruction, and bilateral submucous resection of the inferior turbinates.

On August 24, 2008, plaintiff went to the emergency room at Menorah Medical Center due to a sinus infection (Tr. at 371-381). He reported a history of chronic alcohol and drug abuse (Tr. at 371). Plaintiff weighed 192 pounds (Tr. at 373). Plaintiff was told that the nasal swelling was normal after his recent surgery and should resolve in one to two weeks (Tr. at 380).

On Saturday December 20, 2008, plaintiff saw Kathryn Twenter, D.O., at Menorah Medical Center complaining of pain and swelling in his legs (Tr. at 297-315, 354-368). "He notes that he has been very busy. He has not been sleeping. He has not really been eating or drinking. He is predominantly immobile and working on some projects." He reported that on Wednesday, he had rash symptoms. Thursday his right leg had some pain and redness. By Friday, he had severe left leg pain and mild to moderate right leg pain. Both legs were red and eventually he could not walk without pain. He therefore went to the emergency room. He said he had been sitting at a desk for many hours a day doing work (Tr. at 356). He had stopped taking his Paxil and he had run out of Advair but he was taking Albuterol and Adderall (Tr. at 361). His physical exam was normal except warmth and redness in his leg (Tr. at 357). His mental status exam was normal (Tr. at 357). He was given a prescription for Bactrim (antibiotic) and Benadryl (antihistamine) and discharged; however, his symptoms did not improve so he returned to the emergency room later that night.

His past medical history included asthma (stable), history of ADHD, bipolar disorder, and history of obstructive sleep apnea status post surgical treatment. "The patient is actively

16

looking for a job now. He has a history of tobacco use, none recently.[17] History of alcohol use chronically, but none excessively, and cocaine use, last use 8 years ago and none recently." His physical exam was normal except he had a significant amount of lower extremity edema.[18] A lower extremity deep venous Doppler was performed with no evidence of deep vein thrombosis (blood clot). His primary diagnoses were listed as bilateral lower extremity cellulitis (bacterial skin infection) secondary to venous stasis;[19] history of asthma, asymptomatic; history of ADHD, controlled; Hyperglycemia; and Lymphadenopathy in the inguinal area.[20] He was treated for cellulitis with IV antibiotics and was given deep vein thrombosis prophylaxis and was significantly improved. "I discussed with him proper hygiene and proper mobilization of his legs to avoid further venous stasis in the future."

On January 19, 2009, plaintiff went to the emergency room of the University of Kansas Medical Center complaining of syncope (fainting) (Tr. at 593-596). Plaintiff said he had been using his Adderall and coffee to stay up and work on a paper. He said he went to Shawnee Mission Medical Center last night because he was shaky and was given Celexa (treats depression) to calm him down. He then got sleepy and relaxed and "somewhere in this time is a question of passing out. He claims he was unhappy with the care at SM and drove himself

---

[17]In a separate record on this same hospital visit, plaintiff was noted to be a cigarette smoker (Tr. at 309).

[18]"Edema is swelling caused by excess fluid trapped in your body's tissues. Although edema can affect any part of your body, it's most commonly noticed in the hands, arms, feet, ankles and legs. Edema can be the result of medication, pregnancy or an underlying disease -- often heart failure, kidney disease or cirrhosis of the liver." http://www.mayoclinic.org/diseases-conditions/edema/basics/definition/con-20033037

[19]Venous stasis is a risk factor for forming blood clots in veins (venous thrombosis). Causes of venous stasis include long periods of immobility that can be encountered from driving, flying, bed rest/hospitalization, or having an orthopedic cast.

[20]Abnormally sized lymph nodes in the groin area.

here to get better care.  Claims he is dizzy." Plaintiff reported that he has never smoked.  He did admit to drinking alcohol.  "Patient is giddy hard to give a story he rambles and everything is they, it takes a lot to get the whole story and time line of his past 8 hours."  Plaintiff fell asleep while at the emergency room waiting for his exam.  He said he felt much better and was ready to go home.

On February 16, 2009, plaintiff went to the emergency room at Research Medical Center complaining of suicidal thoughts after a disagreement with his mother and sister (Tr. at 457-464).  He reported alcohol use (Tr. at 458).  His current medications included only Advair and Albuterol, both asthma medications (Tr. at 460).  His mental status exam was normal; his physical exam was normal (Tr. at 459, 460).  Toxicology screen showed an alcohol level of 173 "should be clinically < 80" (Tr. at 459).  His liver enzymes were high (Tr. at 463).  He was assessed with alcohol intoxication and suicidal ideation (Tr. at 459).

On July 13, 2009, plaintiff went to the emergency room at Research Medical Center complaining of asthma (Tr. at 452-455).  He said he had quit smoking 6 months ago (Tr. at 453).  His mental status exam was normal, and his physical exam was normal except wheezes were heard in his lungs (Tr. at 454).  Under social history he reported alcohol use (Tr. at 455).  Plaintiff was treated with Prednisone (steroid) and Albuterol and was discharged (Tr. at 454).

On August 20, 2009, plaintiff saw Glenda Blomquist, M.D. (Tr. at 266).  Plaintiff reported that since his last visit he had been seeing a psychiatrist at Comprehensive Care in Kansas City and was treated with Celexa and Adderall.  He moved back to Lawrence three weeks ago after getting laid off from his job "and not being able to find a job in KC area."  Plaintiff reported doing fairly well with his mood.  He was sleeping OK.  "Plans to enroll in certain classes he has taken before to improve grades.  Felt like [A]dderall was helpful with focus but ran out of it recently."  Plaintiff was noted to have used alcohol in excess in the past

with his last use two weeks earlier.  No medication side effects were noted.  He was diagnosed with mood disorder not otherwise specified and was told to resume taking Adderall.  His prognosis was fair.

On October 19, 2009, plaintiff went to the emergency room at Research Medical Center (Tr. at 465-472).  "Pt called poison control and told them how much hydrocodone he took and they told him to come in." (Tr. at 466).  Plaintiff had found an old bottle of narcotic medication and took it for back pain (Tr. at 466).  He had also consumed alcohol (Tr. at 466)  Plaintiff said he had gained 100 pounds[21] over the past six months (Tr. at 466).  He also said he has a Ph.D. in Economics (Tr. at 466).  He reported having a previous addiction to Adderall (Tr. at 466).  He denied suicidal ideation (Tr. at 467).  Plaintiff was listed as a smoker (Tr. at 468).  Plaintiff's blood work was positive for opiates and showed alcohol intoxication (Tr. at 471).  His liver enzymes were elevated (Tr. at 470).  He was diagnosed with alcohol intoxication and drug overdose.  He was given IV Ativan (treats anxiety) and discharged.

On October 23, 2009,  plaintiff was taken by ambulance to Menorah Medical Center for bilateral lower extremity swelling (Tr. at 316-352).  He had told the ambulance crew that his leg started hurting while he was standing at Kinkos.  He had been up working for the past two days without sleep.  When his leg started to hurt, he also fault nauseated and lightheaded, his speech was difficult, and his face was drooping.  "He has recently begun taking Adderall.  He has gained 90 pounds over the past 7 months."  His mental status exam in the ambulance

---

[21]The record reflects that plaintiff gained a total of 57 pounds from February 10, 2008, through November 4, 2011 -- a period of three years and nine months.  There is no evidence that plaintiff ever gained 90 to 100 pounds at all much less over a short period of time.

| | |
|---|---|
| 02/10/2008 - 183 pounds | 04/19/2010 - 240.5 pounds |
| 08/21/2008 - 195 pounds | 06/29/2010 - 240.8 pounds |
| 08/24/2008 - 192 pounds | 02/25/2011 - 232 pounds |
| 01/11/2010 - 237.6 pounds | 06/29/2011 - 244.6 pounds |
| 01/27/2010 - 233 pounds | 11/04/2011 - 250.2 pounds |

19

was normal. His speech was clear and coherent. "The patient spoke clearly and cooperatively during transport."

In the ER he was sweating, he had tunnel vision, and he reported that he had last slept two days ago. He reported a history of ADHD and Bipolar Disorder. Plaintiff was described as alert and very pleasant, not in any distress. His mood and affect were normal (Tr. at 341). He reported a history of smoking and using alcohol and cocaine but said he had not done those things recently. His liver function tests were abnormal, and he had a serum alcohol level of 132.[22] His drug screen was positive for opiates. Plaintiff's right leg was red and swollen. He had a venous Doppler ultrasound which did not show any evidence of deep vein thrombosis. Chest x-rays were normal. Due to mildly elevated liver function studies, he had an abdominal ultrasound which showed mild fatty infiltration of the liver. Everything else was normal. An ultrasound of his right foot showed swollen tissue but no evidence of an abscess or significant increased blood flow. He was given IV Ancef (antibiotic) and his redness improved. Plaintiff was discharged with a prescription for Doxycycline (antibiotic) and Oxycodone (narcotic).

On October 30, 2009, plaintiff went to the emergency room at Menorah Medical Center with complaints of right leg cellulitis (bacterial skin infection) (Tr. at 353, 401-418). He left to go to court before his assessment and treatment had taken place, and then he returned (Tr. at 404). His physical exam was normal other than some mild warmth and tenderness in his leg (Tr. at 402, 405). He was diagnosed with cellulitis and given a prescription for an antibiotic.

_____

[22]Although there is no mathematical conversion formula for serum alcohol levels and whole blood alcohol levels, it is widely accepted that a serum alcohol level of 132 falls within the 0.8 whole blood alcohol level required to prove legal intoxication. http://www.ncbi.nlm.nih.gov/pubmed/17389080

On November 11, 2009, plaintiff went to the emergency room at Research Medical Center complaining of suicidal thoughts (Tr. at 489-498). "Pt believes he is in purgatory in Chicago." (Tr. at 490). He was observed to be anxious and agitated (Tr. at 491). His liver enzymes were elevated (Tr. at 496-497). His blood work showed alcohol intoxication (Tr. at 497). Plaintiff was assessed with alcohol intoxication and psychosis (Tr. at 491). He was transferred to St. Luke's Hospital in Smithville, Missouri (Tr. at 491).

On Thursday, November 12, 2009, plaintiff was taken to St. Luke's Hospital Northland in Smithville where he was treated by Syed Jaffri, M.D., for complaints of depression and suicidal thoughts (Tr. at 420-445). Plaintiff had not taken his Celexa or Adderall for the past two days (Tr. at 425). He reported depression and anxiety over the past few weeks due to having filed two federal lawsuits and "[h]e just could not find a job, having financial problems, a lot of stress." (Tr. at 429). Plaintiff said he was not sure whether he had ADHD or Bipolar Disorder but had been diagnosed with both, and this problem began in 1989 when he was 9 years old (Tr. at 429). His prior psychiatric treatment included Two Rivers Hospital in March 2001 where he was treated for depression and drug abuse; Menorah Medical Center in October 2001 where he was treated for depression and alcohol abuse; and "Boston Med" in January 2009 where he was treated for alcohol abuse, depression and possible Bipolar Disorder (Tr. at 434). He reported having been hospitalized at Two Rivers in January 2009 and said he began using cocaine and marijuana about a year ago. "He admits problems with alcoholism and has been drinking on a regular basis." (Tr. at 429). "[H]e has been drinking alcohol fairly heavily over the past few months." (Tr. at 431). He reported that he recently quit smoking (Tr. at 431).

Plaintiff reported being three credit hours short of a Masters Degree in Business Administration (Tr. at 429). When asked to report all forms of monthly income, plaintiff wrote

family aid, pending Social Security & unemployment (Tr. at 436). He reported that he has

been convicted of DUI or DWI in the past and that he had been convicted of a crime and was

currently on probation (Tr. at 436). When asked how he would like hospital staff to assist him

during his stay, he wrote, "Let me use my laptop[23] & wifi for side work & consults and to apply

for jobs please and be out by Sunday" (Tr. at 437).

Although the emergency room staff described him as appearing psychotic, Dr. Jaffri

noted that he "does not appear overly psychotic." (Tr. at 431). He was awake and alert and in

no apparent distress (Tr. at 431). He was oriented to person, place and time (Tr. at 432). A

toxicology screen was negative (Tr. at 432). Blood work was normal; EKG was normal (Tr. at

432). The only abnormal observation was that he was hyperverbal (excessive talking) (Tr. at

431).

> HISTORY OF PRESENT ILLNESS: The patient is a 28-year-old Caucasian male who
> presented complaining of depression, feeling stressed out, and [had] been drinking
> heavily as well. He said he had some suicidal thoughts. He wanted to kill himself
> because of all the stress. He reported being sad, unhappy, hopeless, and helpless. He
> has been confused lately. He has been sad. He said doctors have been confused about
> whether he has bipolar disorder or he had ADHD, but he has been nonetheless
> prescribed Adderall for ADHD medication. He does have a history of doing drugs
> including marijuana, crack cocaine, and drinking heavily. . . .
>
> HOSPITAL COURSE: The patient was admitted on the unit, monitored for safety. The
> patient reported being depressed, but did not appear depressed. He was somewhat
> manic like and somewhat pressured speech, but redirectable, though initially was
> somewhat hyper but he states always a little bit hyper because of his problems. On the
> unit, the patient was monitored, he has been interacting and socializing without much
> problem and following directions, participating in activities, interacting with staff
> appropriately, then he started asking to be discharged, saying depression is better, he
> needs to go back home, and go to the court. Since the patient did not have any thoughts
> of hurting self or any body else, he was not homicidal or suicidal, checked with his
> family who are fine with him coming back home. He was discharged back home with
> plan to follow up with his own psychiatrist so he can get back on his medication.

---

[23]Plaintiff was apparently permitted to use his laptop while in the hospital, as his application
for disability benefits was filed on November 13, 2009, while he was in the hospital (Tr. at 61).

At the time of discharge, the patient was not homicidal or suicidal. The depression was looking better too, which he said was pretty much gone.

(Tr. at 421). Plaintiff was discharged on Saturday, November 14, 2009 (Tr. at 421).

On November 18, 2009, plaintiff underwent an initial assessment at Swope Health Services (Tr. at 511-521). He had been referred for medication management and outpatient therapy by St. Luke's Hospital. Plaintiff reported having gained about 90 pounds in the last year "due to consumption of food and alcohol." Plaintiff was sleeping OK, from about 2 a.m. to 10 a.m. Plaintiff said his mood had improved due to therapy and medication at St. Luke's, but they had not given him any medication when he left. Plaintiff said, "I have ADHD and ever since I've gotten off my medication it has gotten more severe. Not necessarily confusion but not being able to focus." Plaintiff denied hallucinations and delusions. He reported daily panic attacks. Plaintiff reported having had two DUI convictions, in 2003 and 2006. "Unemployed, was employed at Chrysler Financial. Ct was feeling stressed, overwhelmed had some medical issues and the company was looking to lay people off. The company would not provide relief so client quit." He said he had a bachelor's degree in economics/public administration and that he was three classes shy of an MBA. He was currently appealing an unemployment benefits decision, and he had also applied for Social Security disability benefits. He continued to use alcohol (6 to 10 drinks) daily. "Ct is prescribed Celexa and Adderall and has been out of medication for three weeks." Plaintiff was assessed with ADHD, major depressive disorder recurrent severe with psychotic features, anxiety disorder not otherwise specified, and alcohol dependence, in addition to "r/o [rule out] PTSD [post traumatic stress disorder], GAD [generalized anxiety disorder] and panic disorder."

On December 4, 2009, plaintiff saw Mark Cannon, M.D., at Swope Health Services requesting psychiatric medication management (Tr. at 510, 540). "He has a history of ADHD. Has responded effectively in the past to Adderall in combination with Wellbutrin [treats

23

depression].  Describes problems with attention, concentration, focus, distractibility and hyperactivity dating back to grade school.  Had a good response to these medications."  Plaintiff reported a history of alcohol overuse but said he had been sober for some time.  He said he had an MBA but was currently unemployed.  "Hygiene and grooming was good.  Eye contact was good.  Speech of normal rate, quality and tone.  Normal motor activity.  Mood seemed euthymic with appropriate affect.  No suicidal thoughts, no thoughts of hurting others.  No psychotic symptoms.  No cognitive impairment. Insight and judgment good."  Dr. Cannon assessed ADHD combined type and mood disorder not otherwise specified.  He prescribed Adderall XR and Wellbutrin SR with no refills and told plaintiff to come back in a month.

On December 29, 2009, plaintiff called Dr. Cannon's office and "advis[ed] he is working so cancelling medication and therapy session." (Tr. at 510, 540).

On January 11, 2010, plaintiff was seen at Swope Health Services (Tr. at 505, 509, 525-526, 534-535, 539, 541, 569).  He reported no alcohol use.  He weighed 237.6 pounds.  He had a pulmonary function test which showed possible early obstructive pulmonary impairment.  It was recommended that he have the test repeated after using a bronchodilator.  Plaintiff also saw Dr. Cannon for a follow up.  "He is pleasant and cooperative.  Mood euthymic.  Good attention, concentration and focus.  Tolerating medications well.  He has no complaints."  He was assessed with ADHD combined type and mood disorder not otherwise specified.  His Adderall XR and Wellbutrin were refilled.

On January 27, 2010, plaintiff was seen at the University of Kansas Medical Center complaining that he had been out of his asthma medications for a week and was wheezing (Tr. at 591-593).  His psychiatric/behavioral exam was normal.  He reported drinking 18 cans of beer per week.  He weighed 233 pounds.  His physical exam was normal with no wheezing

24

heard after undergoing a breathing treatment. He was provided with an albuterol inhaler and a prescription for Advair.

On the morning of February 16, 2010, plaintiff went to the emergency room at Research Medical Center complaining of anxiety (Tr. at 473-484). He said he was having difficulty focusing, and that symptom had started that day (Tr. at 474). Plaintiff said he had quit smoking a year ago (Tr. at 474). Plaintiff was described as "happy/giddy" (Tr. at 475). His mood and affect were normal (Tr. at 474). His physical exam was normal (Tr. at 474). He denied suicidal ideation (Tr. at 474). He reported that he thought he had been given the wrong drug by the pharmacy a week ago because he had been experiencing increased irritability (Tr. at 476). His blood work showed alcohol intoxication (Tr. at 479). Plaintiff was assessed with alcohol intoxication (Tr. at 474).

In mid-afternoon that same day, plaintiff returned to the emergency room at Research Medical Center (Tr. at 475-488). Plaintiff reported memory loss and again stated that he had been given the wrong prescription by the pharmacy (Tr. at 475). Plaintiff complained of feeling depressed, angry, frustrated, agitated, hostile, and paranoid (i.e., he gave a positive response to all of the choices on the form) (Tr. at 485). The notes state that plaintiff was on Facebook via his laptop during his entire stay in the emergency room (Tr. at 486, 488). He was assessed with amphetamine abuse (Tr. at 486).

On February 23, 2010, plaintiff saw Dr. Cannon for a follow up (Tr. at 508, 538). "Apparently was given the wrong medication at the pharmacy, as a result had a period of agitation, which resulted in a minor conflict at work. He is currently on medical leave. Filled out some papers related to his leave from work. Looked at ways of resolving the situation. Pleasant and cooperative. Fair dressed and grooming. Had been doing well on the combination of medications previously prescribed." Dr. Cannon assessed ADHD combined

type and mood disorder not otherwise specified. He refilled plaintiff's Adderall XR and Wellbutrin.

On April 19, 2010, plaintiff saw Dr. Cannon for a follow up (Tr. at 507, 532-533, 537). On this day he weighed 240.5 pounds. He reported sleeping 8 to 10 hours per night and consuming alcohol about four times per week. His physical exam was normal except he was considered mildly obese and scant wheezing was heard in his lungs, the right greater than the left. "The pharmacy issue in the previous note of December 23 apparently has resolved. Would like to get back on his Adderall XR also was open to the possibility that he may have some mood cycling symptoms. He has agreed to take some Tegretol.[24] Well dressed and groomed. Pleasant and cooperative. Speech somewhat pressured and increased. Judgment intact." Plaintiff was diagnosed with ADHD combined type and mood disorder not otherwise specified. His Adderall XR and Wellbutrin were refilled and he was prescribed Tegretol. He was told to decrease his salt intake, lose weight and exercise.

On June 16, 2010, plaintiff went to the emergency room at the University of Kansas Medical Center with a chief complaint of, "I want help with restarting Outpatient Psychiatry" (Tr. at 573-590). Plaintiff was brought to the emergency room by Mission Hills police because he approached them and told them to shoot him. "He reports doing this as he knew he needed help and [thought this was] the only way to be inpatient and get help quicker. To achieve this he reports 'I lied that I was suicidal to get help.' Currently he denied being suicidal, ever having plans or intent. . . . Reported being laid off from job in March, since then he has been staying in his mother's place and reports losing insurance. So could not afford his Adderal [sic] and Wellbutrin which worked for him in the past. Stopped taking his medications for almost a week, instead substituted with alcohol." Plaintiff said he had consumed 24 beers over the past

_____

[24]Tegretol is a mood stabilizer.

two days.  Elsewhere in this record, plaintiff reported having been out of his Wellbutrin and Adderall for the past three weeks and during that time he had been consuming alcohol.  He told yet another person that he had been off his medications for the past month.  "Sleeps for 8-10 hrs a day, appetite, energy, concentration are fair. Currently is hyperverbal and grandiose but easy to interrupt.  Denied any PTSD symptoms.  [Wants] psychiatric help and discharg[e] prior to Wednesday due to pending civil case where he would have benefit."  Plaintiff's sister reported that plaintiff had been drinking 16 to 18 beers per day for the past three to four months.  "She reports stressors include litigation case over boat.  She endorsed he is suing someone for stealing his boat."

Lynne Larsen, M.D., observed plaintiff to be calm and cooperative, his mood was "okay," his affect was euthymic, his thought processes were linear and goal oriented, and he was alert and fully oriented.  He was able to concentrate, his insight was fair, but his judgment was poor.  His lab report showed alcohol intoxication.  "Pt reported he thought he lost his insurance, which was verified that he still had Medicaid and could return back to his previous psychiatrist and obtain further therapy and resources."  Dr. Larsen wrote, "During my interview the patient freely admitted that he manipulated the system in order to be admitted to the hospital, with the goal of getting outpatient treatment arranged for himself."  Plaintiff was told to continue to follow up at Swope Parkway Behavior Health for outpatient mental health treatment, and treatment for substance abuse was recommended.

On June 29, 2010, plaintiff was seen by Dr. Cannon at Swope Health (Tr. at 506, 522, 536).  "He had a mixup with his Adderall.  Was inadvertently given the immediate-release form of Adderall from the Pharmacy.  This resulted in, by the parents, excitation of mood.  It resulted in a brief visit to the emergency room. This has resulted in complications with getting his Adderall XR refilled."  Plaintiff's blood work showed elevated liver enzymes (Tr. at 503,

27

542, 567). His cholesterol and triglycerides were also elevated (Tr. at 504, 543, 568). He weighed 240.8 pounds (Tr. at 522). No examination was performed and no observations were noted. Plaintiff was diagnosed with ADHD, combined type, and mood disorder not otherwise specified. His Adderall XR and Wellbutrin were refilled and he was told to return in two months.

On August 23, 2010, Elissa Lewis, Ph.D., completed a Psychiatric Review Technique (Tr. at 544- 555). She found that plaintiff's impairment is not severe. She found that he had no restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. Dr. Lewis summarized plaintiff's medical records and administrative documents and then wrote, "The claimant's symptoms are worse when he has been drinking heavily. He had a brief exacerbation after receiving the wrong form of Adderall. Otherwise he does very well and is stable on his medications."

On September 14, 2010, plaintiff saw Dr. Cannon for a follow up (Tr. at 611). "He is having some residual fluctuation. Looked at adding an additional mood stabilizer. No suicidal thoughts, no thoughts of hurting others. Overall feels like the Adderall has significantly increased his attention, concentration and focus, no side effects." He assessed ADHD combined type and mood disorder not otherwise specified. He refilled plaintiff's Adderall and Wellbutrin and added Topamax (anticonvulsant). He told plaintiff to return in two months.

On November 19, 2011, plaintiff saw Dr. Cannon at Swope Parkway Health Services for a follow up (Tr. at 610). "Some residual impulsivity and overactivity. We will make a slight adjustment in his Adderall. Fair dressed and grooming. Good eye contact. Speech somewhat pressured." He was assessed with ADHD combined type and mood disorder not

28

otherwise specified.  Dr. Cannon provided prescriptions for Adderall, Wellbutrin and Topamax and told plaintiff to return in two months.

On January 10, 2011, plaintiff was seen at Swope Parkway Health Services (Tr. at 609). His mood was euthymic and his affect was congruent.  "There was no evidence of psychosis. Denies concerns today."  His Adderall, Wellbutrin and Topamax were refilled and he was told to return in two months.

On February 25, 2011, plaintiff was seen at Swope Parkway Health Services for asthma (Tr. at 566, 607-608).  He had a pulmonary function test performed at which showed possible early obstructive pulmonary impairment.   It was recommended that he repeat the test following use of a bronchodilator.  He weighed 232 pounds on this day.  Asthma medications were prescribed with three refills.

On April 5, 2011, plaintiff called the Swope Parkway Health Services Crisis Line (Tr. at 605).  "Client is completely out of medical Adderall.  He has appt. coming up on April 22nd. He was seen on Feb. 25th by nurse practitioner.  Need refill immediately until next appt. Medication is control[led] substance."  Plaintiff said he would be notified when his prescription was ready.

On April 11, 2011, plaintiff telephoned Swope Parkway Health Services Crisis Line (Tr. at 604).  "Client stated he has been depressed and drinking excessively.  He may not know what he is going to do to himself if he doesn't get Adderall prescription immediately."  Plaintiff was told that he could come pick up a prescription for Adderall.

On April 22, 2011, plaintiff was seen at Swope Parkway Health Services (Tr. at 606). Plaintiff said that he was under a lot of pressure, that he had had some panic attacks, that he had been "done wrong by many people."  He had run out of his medications but had just

gotten them filled. He was observed to have disorganized thought process, his speech was rambling. He was started on Risperdal (antipsychotic) and Vistaril (treats anxiety).

On June 29, 2011, plaintiff saw Milton Levin, M.D., at Swope Health Services (Tr. at 563-564, 602-603). "Patient is asthmatic and has run out of his meds and has no means of obtaining them. Lost his job. Now having problems with his breathing." Plaintiff weighed 244.6 pounds. Plaintiff's physical exam was normal. He was assessed with "Asthma, unspecified, unspecified status". He was prescribed medication with five refills.

On July 1, 2011, at 9:45 a.m. plaintiff telephoned Swope Parkway Health Services (Tr. at 601). Plaintiff spent an hour on the phone. He said that he had been out of his medications and that he was drinking. He said he has bad thoughts when he is not on medication and he has trouble staying focused. The psychiatric nurse stated that the psychiatrist wanted to see plaintiff before writing any prescriptions. An appointment was arranged for later that day.

On July 1, 2011, at 1:45 p.m. plaintiff was seen at Swope Parkway Health Services (Tr. at 600). Plaintiff said he had just returned from looking for a job. He denied depression. "Wants Ativan - discouraged." Plaintiff's Adderall was decreased, his Wellbutrin was increased and his Topamax was refilled. "Wants to titrate off Adderall and try non-stimulant med soon."

On September 22, 2011, plaintiff was seen at Swope Parkway Health Services (Tr. at 599). Most of this record is illegible. Plaintiff did say he was only taking Adderall and Wellbutrin at this time. Those two medications were refilled and he was told to return in a month.

On October 28, 2011, plaintiff was seen at Swope Parkway Health Services (Tr. at 598). Much of this record is illegible, but plaintiff was told "to lose wt." His drinking was also discussed in this record. Plaintiff reported being self employed but trying to find a full-time

job.  His Adderall and Wellbutrin were refilled and he was told to come back in a month.

On November 4, 2011, plaintiff saw Thomas Good, M.D., a cardiologist at St. Luke's Health System with complaints of palpitations/arrhythmias and hypertension (Tr. at 559-562).

> . . . Mr. Jaax clearly notes an increase in the palpitations in mid morning to early afternoon.  This occurs several hours after he takes his daily dose of Adderall and Advair.  He notes fairly predictable episodes when using his albuterol inhaler. Otherwise, he denies any symptoms of lightheadedness, syncope, or near syncope.

Plaintiff reported that he was self employed.  He said he stopped smoking in 2006 and that he currently drinks eight bottles of beer weekly.  Plaintiff was 5' 6" tall and weighed 250.2 pounds.  His blood pressure was 124/86.  His gait was normal.  No joint or spine deformities were noted.  He was alert and fully oriented.  His mood was normal.

> Impressions:
> 1. Palpitations, which are no doubt due to chronic use with amphetamines [Adderall] as well as intermittent beta agonists.  These appear to be benign and no further workup is warranted.
> 2. The question of hypertension is somewhat more problematic.  I have suggested he purchase a blood pressure machine and to begin daily records for the next 1 month.  I did start him on a low dose of hydrochlorothiazide [diuretic] 12.5 mg daily.  We have scheduled a 1-month followup with our advanced nurse practitioner to monitor his blood pressure response and to adjust medication if needed.

On November 18, 2011, plaintiff saw a nurse practitioner at Swope Parkway Health Services (Tr. at 597).  "Reports doing well [on] Adderall XR 30 mg/d.  Wants to wait until after his exam to taper off Adderall."  Plaintiff said he did not think Wellbutrin was working as well as it had previously.  He asked about Zoloft.  He was assessed with ADD "stable".  He was told to taper off his Wellbutrin over the next two weeks and then start Zoloft. His Adderall was refilled.

## V.     FINDINGS OF THE ALJ

Administrative Law Judge Sharilyn Hopson entered her opinion on April 27, 2012 (Tr. at 9-18).  Plaintiff's last insured date was December 31, 2014 (Tr. at 11).

Step one. Plaintiff has not engaged in substantial gainful activity since his alleged onset date, although he had unsuccessful work attempts subsequent to that date (Tr. at 11). "The claimant tried jobs after his alleged onset date but he contends that he was fired from each one because of his disability. The claimant was fired from the jobs because he was 'investigating fraud' in the companies, which was outside his duties. The claimant was also trying to give his employers 'sensitivity training' about his disability." (Tr. at 11).

Step two. Plaintiff's severe impairments include:

> attention deficit hyperactivity disorder (ADHD) by history (but he claims that he can research for hours fraud in the companies and Satanism and religion and spirituality - he doesn't seem to have a problem focusing on this or paying attention); a mood disorder, not otherwise specified; a personality disorder with narcissistic feature (this is very obvious from his testimony as well as his manipulative personality); polysubstance abuse (this may be in early remission and is not the primary problem - therefore, although it is a severe impairment even with the substance abuse is not disabled, therefore it is not material to the decision) sleep apnea; and asthma (Exhibit 6F states possible early obstructive pulmonary impairment - I am combining this with asthma).

(Tr. at 11-12).

Plaintiff's hypertension is controlled with medication (Tr. at 12). There are no objective findings to support his allegations regarding the severity of his benign palpitations due to chronic use of Adderall and his hypertension. His history of nasal trauma, history of deviated septum, benign palpitations and hypertension are nonsevere impairments (Tr. at 12).

Plaintiff is obese at 5'6" tall and weighing 250 pounds (Tr. at 12). However, his daily activities demonstrate that his obesity does not cause more than a minimal effect on his ability to perform basic work activities (Tr. at 12). Therefore, his obesity is a nonsevere impairment (Tr. at 12).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 12-14).

Step four.  Plaintiff has the residual functional capacity to perform a full range of work at all exertional levels.  He must avoid concentrated exposure to pulmonary irritants and avoid exposure to excessive heat or cold and humidity.  He should have no jobs in which he would have emotionally charged or intense interaction with others, no work at unprotected heights and no work around hazardous or dangerous machinery.  He should have no jobs in which he would be responsible for the safety of others and no jobs which require hypervigilance (Tr. at 14).  With this residual functional capacity plaintiff is unable to perform his past relevant work as a tax accountant, collections clerk, bank teller, or chauffeur (Tr. at 17).

Step five.  Plaintiff is able to perform the duties of a hand packager or a janitor, both available in significant numbers (Tr. at 18).  Therefore plaintiff is not disabled (Tr. at 18).

## VI.    PLAINTIFF'S ARGUMENTS

Plaintiff, acting pro se in this case, has raised myriad issues with respect to the ALJ's opinion.  I have attempted to extract all of the arguments presented in plaintiff's brief and will deal with each separately.

1.    **"The ALJ here relies heavily on several documents which are not in the record. The ALJ committed error when [s]he relied on evidence outside the record."**  Plaintiff does not identify what evidence the ALJ relied upon that was not a part of the record.  I have found no reference in the ALJ's opinion to any document or testimony that was not in the record. This argument is without merit.

2.    **The ALJ did not mention the disability assessment of Dr. Mark Cannon which was a part of the record.**  The disability assessment referred to by plaintiff was not a part of the record until it was presented to this court as an exhibit attached to plaintiff's brief.  It is a one-page "Attending Physician's Statement" which asks for a beginning and ending date of "total disability," and Dr. Cannon wrote, "2/18/2010 through present."  The date of "illness" or

33

"injury" causing the disability is "2/18/2010." The form is dated February 23, 2010 -- five days after plaintiff's "total disability" began.

The form asks what restrictions are placed on the patient. Dr. Cannon wrote, "Temporary leave from work." He then checked a box corresponding to the following: "Patient is unable to engage in stress situations and engage in interpersonal relations (marked limited)."

In order to present evidence that was not before the ALJ, plaintiff must show that the evidence is new, material, non-cumulative, and related to the denial period at issue. Whitman v. Colvin, 762 F.3d 701, 710 (8th Cir. 2014). In addition, plaintiff must show good cause for the failure to incorporate the evidence into the record of the prior proceeding. Id. Pro se representation is not "good cause." Id. Plaintiff has not addressed any of these requirements.[25] For this reason, plaintiff's arguments involving this medical opinion are without merit. However, I find that even had the ALJ considered this form, the result would not have been different.

This is a form provided by Aetna, an insurance company, for short-term disability. In fact, it is only page three of a three-page document entitled "STD Disability Employee Request".[26] It does not include any opinion as to plaintiff's functional abilities. An opinion by a doctor that a claimant is totally disabled involves an issue reserved for the Commissioner and therefore is not the type of "medical opinion" to which the Commissioner gives controlling weight. McDade v. Astrue, 720 F.3d 994, 1000 (8th Cir. 2013); Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). The check mark indicating plaintiff is unable to engage in stress

---

[25]Defendant pointed out all of these requirements in her response, and plaintiff chose not to file a reply brief.

[26]Aetna form GC-1560-4 (3-09)

situations or interpersonal relations due to poor concentration/focus is inconsistent with Dr. Cannon's treatment record of the same day wherein he found that plaintiff was pleasant, cooperative, and doing well on his prescribed medications, and listing no abnormal observations or complaints.

Finally, the duration of plaintiff's disability according to this form was somewhere between 5 days and 70 days, not 12 months as required by the Social Security Act. February 8, 2010, was the beginning of the "total disability" according to this form. The disability went "to present" which was February 23, 2010, five days later. Although plaintiff argues that there is no evidence that his "total disability" has ever ended, the record does not support this. On the day this form was completed by Dr. Cannon, he wrote in his own treatment record that plaintiff was currently on medical leave because of being given the wrong form of Adderall by the pharmacy. By April 19, 2010 -- 70 days later -- Dr. Cannon wrote in his treatment record, "Pharmacy issue has resolved." Therefore, the longest Dr. Cannon could have considered plaintiff "totally disabled" according to his treatment notes was 70 days.

On February 23, the day the form was completed, Dr. Cannon noted that plaintiff was pleasant and cooperative. "Had been doing well on the combination of medications previously prescribed." He continued to prescribe those same medications, which establishes that once the pharmacy error had been rectified and plaintiff was back on his normal medications, he would again be "doing well." There is no support in Dr. Cannon's treatment records for an interpretation of this form that Dr. Cannon believed that plaintiff was totally disabled or markedly limited in any mental function, or that he believed plaintiff's total disability would continue indefinitely.

Based on the above, I find that (1) plaintiff failed to show good cause for not presenting this record to the ALJ, (2) the record is not new and non-cumulative, (3) the record contains

an opinion reserved to the Commissioner, (4) the form is not supported by Dr. Cannon's treatment records, and (5) the form does not establish that plaintiff suffered from limitations that extended at least 12 months. As a result, this form does not change the outcome of plaintiff's case or require remand.

3. **The ALJ relied on the opinion of a doctor who "never once examined Plaintiff".** Plaintiff does not identify the opinion; however, the only non-examining opinions in the record are that of Joseph Malancharuvil, Ph.D., who testified as an expert at the administrative hearing and Elissa Lewis, Ph.D., who completed a Psychiatric Review Technique finding that plaintiff's mental impairment is not severe. Opinions by non-examining psychological consultants are proper. 20 C.F.R. §§ 404.1513, 416.913.

The ALJ noted Dr. Malancharuvil's opinion that plaintiff's limitation in the ability to maintain social functioning was only mild; however, the ALJ ultimately found that his social functioning limitation was moderate. Therefore, the ALJ's residual functional capacity assessment was more restrictive than that found by the expert witness (Tr. at 13). The ALJ gave significant weight to the opinion of Dr. Lewis because it was "based upon a thorough review of the evidence and familiarity with Social Security Rules and Regulations and legal standards set forth therein." In addition, the opinion was "well-supported by the medical evidence, including the claimant's medical history and clinical and objective signs and findings as well as detailed treatment notes" and the opinion was "not inconsistent with other substantial evidence of record." (Tr. at 16).

Plaintiff's treatment records are not inconsistent with the opinions of Dr. Malancharuvil or Dr. Ellis, nor are they inconsistent with the residual functional capacity assessment of the ALJ. The treatment records reflecting abnormal mental findings consistently established that the causes were plaintiff's substance abuse and his failure to take his medication as prescribed.

- On June 27, 2008, plaintiff had stopped taking his medication and had been drinking alcohol and as a result he claimed he had become irritable. Despite this, he was noted to be cooperative and had good eye contact.

- On July 23, 2008, plaintiff's problems which were causing him stress were all financial. He was cooperative and had good eye contact, and his thought processes were somewhat linear and goal directed.

- On August 12, 2008, plaintiff said he still had a job and had been promoted, indicating that he was functioning well.

- On December 20, 2008, plaintiff told Dr. Twenter that he had been "sitting at a desk for many hours a day doing work," which contradicts his claim that he cannot focus or concentrate. He had stopped taking his Paxil. Mental status exam was normal. Plaintiff was "actively looking for a job now," another indication that he did not at that time consider himself incapable of performing any job.

- On January 19, 2009, plaintiff said he had been using his Adderall and coffee to stay up and work on a paper, again inconsistent with an inability to concentrate or focus.

- On February 16, 2009, plaintiff was taking no psychiatric medications and complained of suicidal thoughts after a disagreement with family members. His mental status exam was normal and he was assessed with alcohol intoxication.

- On July 13, 2009, his mental status exam was normal.

- On August 20, 2009, he said he had been trying to find a job. He was doing fairly well with his mood, he was sleeping OK, he was planning to enroll in classes. He denied medication side effects. He had run out of Adderall.

- On August 19, 2009, plaintiff tested positive for opiates and alcohol intoxication.

- On October 23, 2009, he indicated he had been up working for the past two days. His mental status exam was normal. His speech was clear and coherent. He was cooperative. At Menorah Medical Center he was alert and very pleasant, his mood and affect were normal. He tested positive for opiates and alcohol intoxication.

- On November 11, 2009, while at Research Medical Center, plaintiff said he believed he was in Purgatory in Chicago. He had not been taking his psychiatric medications and admitted having been drinking fairly heavily on a regular basis. His depression and anxiety were caused by not being able to find a job and having financial problems.

- On November 12-14, 2009, at St. Luke's, Dr. Jaffri found that plaintiff did not appear psychotic, he was alert and fully oriented. Although plaintiff reported being depressed, Dr. Jaffri noted that plaintiff did not appear depressed. Plaintiff was able to interact and socialize without much problem, he was able to follow directions, he could interact with staff appropriately. Plaintiff was able to apply for disability benefits from his computer while at St. Luke's.

37

- On November 18, 2009, plaintiff denied problems with confusion even when off his medication. He said he had problems focusing when he was off his medication. At that time he had been out of his psychiatric medications for three weeks and continued to consume 6 to 10 alcoholic drinks per day.

- On December 4, 2009, Dr. Cannon noted that plaintiff's hygiene and grooming were good, his eye contact was good, speech was normal, motor activity was normal, mood was normal, affect was appropriate, he had no suicidal or homicidal thoughts, no psychotic symptoms, no cognitive impairment, good insight, good judgment. Dr. Cannon noted no abnormal findings.

- On January 11, 2010, Dr. Cannon noted that plaintiff was pleasant and cooperative, his mood was normal, he had good attention, good concentration, good focus. He was tolerating his medications well, and plaintiff had no complaints. Plaintiff was not consuming alcohol at this time.

- On January 27, 2010, medical professionals at KU Medical Center noted that plaintiff's psychiatric/behavioral exam was normal. Plaintiff was drinking 18 cans of beer per week at this time.

- On the morning of February 16, 2010, plaintiff's blood work at Research Medical Center showed alcohol intoxication. Later that day he returned and was assessed with amphetamine abuse.

- On February 23, 2010, plaintiff was described by Dr. Cannon as pleasant and cooperative. He had been doing well on the combination of medications previously prescribed, and Dr. Cannon refilled those same medications.

- On April 19, 2010, plaintiff was well dressed, well groomed, pleasant, cooperative. His judgment was intact. He continued to consume alcohol four times per week.

- On June 16, 2010, plaintiff was seen at KU Medical Center and indicated he had stopped taking his psychiatric medications anywhere from a week to a month earlier and had been consuming large quantities of alcohol. He was able to sleep 8 to 10 hours per day; and he said his appetite, energy and concentration were fair. Dr. Larsen observed plaintiff to be calm and cooperative, his mood and affect were normal, his thought processes were normal, he was alert and fully oriented, he was able to concentrate, his insight was fair. His judgment was poor. Lab work showed alcohol intoxication, and plaintiff's sister reported that he had been drinking 16 to 18 beers per day for the past three to four months.

- On June 29, 2010, Dr. Cannon refilled plaintiff's medication without any changes.

- On September 14, 2010, plaintiff said overall he felt like the Adderall had significantly increased his attention, concentration and focus with no side effects.

- On January 10, 2011, at Swope Parkway plaintiff's mood and affect were normal and he showed no evidence of psychosis. Plaintiff denied concerns and his medication was

refilled without changes. Although plaintiff was told to return in two months, he did not do this.

- On April 5, 2011, plaintiff called Swope Parkway and said he was completely out of Adderall; on April 11, 2011, he said had been drinking heavily. He was told to come pick up his Adderall. On that day his thought process was disorganized and his speech was rambling.

- On July 1, 2011, plaintiff called Swope Parkway, again reporting that he had been out of his medications and had been drinking. He said he was having trouble staying focused. When he came in that day, he said he had just been out looking for a job. He denied depression.

- On October 28, 2011, plaintiff was self employed but was trying to find a full-time job. He continued to take only Adderall and Wellbutrin.

- On November 4, 2011, plaintiff told Dr. Good that he was self employed and that he continued to use alcohol. Dr. Good found plaintiff alert and fully oriented with normal mood.

- On November 18, 2011, plaintiff reported he was doing well on Adderall. His ADHD was noted to be stable.

In addition to the above medical records which are consistent with the opinions of the non-examining sources, I point out that plaintiff testified at the administrative hearing, "I'm very stabilized when I take my medication."

I find no error in the extent to which the ALJ relied on the opinions of the non-examining doctors.

4.     **The ALJ failed to state the weight he gave to "several opinions of mental limitations by examining and non-examining sources."** Plaintiff does not identify any opinion or any doctor who provided an opinion which was not discussed by the ALJ other than the disability assessment of Dr. Cannon which is addressed above.

5.     **There is no specific testing for memory or mental ability or even limitations upon plaintiff in the record other than the opinion of Dr. Cannon.** As discussed above, Dr. Cannon's opinion was not a part of the record. Plaintiff's treatment records pertaining to his mental condition are outlined above and will not be repeated here. They establish that

39

plaintiff's mental limitations are related to his alcohol abuse and his failure to take his prescribed medication. Failure to follow prescribed medical treatment without good cause is a basis for denying benefits. <u>Bernard v. Colvin</u>, -- F.3d --, 2014 WL 7238033 (8th Cir. (Minn.), December 22, 2014) ("Todd admitted he was not taking his anti-depressant medication because of his drinking"); <u>Kelly v. Barnhart</u>, 372 F.3d 958, 961 (8th Cir. 2004). In addition, plaintiff complained of memory problems on only one occasion during the entire four and a half years covered by this record. That occurred on February 26, 2010, when he complained that he had been given the wrong prescription by the pharmacy. On that day, plaintiff was diagnosed with both alcohol intoxication and amphetamine abuse.

      **6.**     **The ALJ did not incorporate Dr. Cannon's opinion that plaintiff needs limited to no contact with coworkers and the public.** Again, Dr. Cannon's opinion was not before the ALJ, and the opinion contained in the Aetna form is contradicted by Dr. Cannon's treatment records.

      **7.**     **A medical consultant found that plaintiff is moderately limited in the ability to maintain regular attendance and to be punctual within customary tolerances and that he may have interruptions to a normal workweek due to psychologically-based symptoms, that he may have episodic difficulty for social relations with coworkers and the general public and in dealing with criticism from supervisors.** Plaintiff does not identify what doctor made these findings. I have found no such findings in the record before me.

      **8.**     **The consultant did not consider depression or borderline intellectual functioning which the ALJ accepted.** Plaintiff does not identify what consultant did not consider these things. Further, what a consultant did or did not accept is immaterial -- the ALJ determines a claimant's residual functional capacity. Finally, the ALJ by no means found that plaintiff suffered from borderline intellectual functioning, and there is no evidence in the

record even suggesting such a thing. In fact, on December 4, 2009, Dr. Cannon, plaintiff's treating psychiatrist, found "no cognitive impairment."

9. **"The ALJ here cites evidence which does not exist in which the Plaintiff has the ability to work 'many jobs' based on his ability to conduct research on the internet."** In considering a claimant's credibility, the ALJ is required to consider the claimant's daily activities. McDade v. Astrue, 720 F.3d 994, 998 (8th Cir. 2013). In this case, that included plaintiff's Internet use. However, the ALJ did not base her finding that plaintiff was not disabled on his Internet usage.

10. **The ALJ improperly based her opinion "on a doctor who . . . had seen Plaintiff one time for no more than a 5 minute session".** Plaintiff does not identify which doctor saw him for only five minutes but provided an opinion on which the ALJ relied. In any event, I have discussed at length above the evidence in the record on which the ALJ properly relied in assessing plaintiff's residual functional capacity.

11. **The ALJ's hypothetical involved a person with the same education as plaintiff. Plaintiff testified that he has a college degree. "But this did not inform the vocational witness of Plaintiff's ongoing and concurrent actual educational and cognitive functioning at the time of these disabilities."** There is no evidence of any cognitive impairment, and as mentioned above plaintiff's treating psychiatrist found no cognitive impairment. Additionally, there is no evidence that plaintiff suffered any trauma or that his cognitive ability deteriorated after he earned a college degree but before his alleged onset date.

12. **The ALJ made contradictory findings that obesity does and does not affect plaintiff's ability to work.** The ALJ acknowledged that "the effects of obesity must be considered when evaluating disability claims, since the effects of obesity in combination with other impairments can be greater than the effects of each impairment considered separately.

41

Thus, any additional and cumulative effects of the claimant's obesity must be considered in assessing the claimant's impairments under each step of the sequential evaluation process. These considerations have been taken into account in reaching the conclusions herein." (Tr. at 13). There is no evidence that plaintiff suffers from any physical impairment. Yet, the ALJ restricted plaintiff to no exposure to excessive heat, cold or humidity which presumably was due at least in part to consideration of plaintiff's obesity, since the only other physical impairments in the record are plaintiff's sleep apnea (which was resolved after his surgery in 2008) and asthma, which was noted to be stable and asymptomatic by Dr. Twenter in 2008. Plaintiff was treated for asthma symptoms on only one occasion other than a handful of times when he experienced symptoms after failing to use his asthma medication as directed.

In addition, plaintiff's argument is foreclosed by <u>Anderson v. Barnhart</u>, 344 F.3d 809, 814 (8th Cir. 2003), in which the court of appeals held that a claimant had waived for appeal his claim that the ALJ did not consider his obesity as an impairment, by failing to allege any functional limitation from obesity in his application for benefits or during the hearing.

13. **Obesity "exacerbates Plaintiff's musculoskeletal impairments".** There was never any allegation that plaintiff suffered from a musculoskeletal impairment, and there is no evidence that plaintiff has any musculoskeletal impairment.

14. **Plaintiff "could not lose weight" even though he was advised to by his doctors.** Although this is not grounds for reversal of the ALJ's opinion, I do note that there is no evidence that plaintiff could not lose weight. The medical records clearly show that plaintiff attributed his weight gain to "consumption of food and alcohol." There is no evidence that plaintiff attempted to exercise and diet as directed by his doctors but was unsuccessful.

15. **The ALJ erroneously concluded at step four of the sequential analysis that plaintiff could return to his past relevant work as a tax accountant.** This is another

Case 4:13-cv-00944-REL   Document 30   Filed 01/26/15   Page 42 of 43

misstatement on plaintiff's part. The ALJ found at step four of the sequential analysis that plaintiff could not perform any past relevant work, including that of a tax accountant. The ALJ found at step five of the sequential analysis that plaintiff was capable of performing other jobs available in significant numbers, and representative occupations included hand packager or janitor.

## VII.  CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
January 26, 2015

43